We move to the third case this morning, Wilson v. Adams. Mr. Lilly? Good morning, Your Honors, and may it please the Court, My name is Stephen Lilly, and I represent Plaintiff Appellant Donald Wilson in this matter. A reasonable jury could conclude that Dr. Murphy and Dr. Adams were deliberately indifferent and negligent in their response to Mr. Wilson's chronic physical and mental problems. Mr. Wilson has presented evidence that, viewed in a light most favorable to him, raises a clear inference that Dr. Murphy and Dr. Adams did not act on the basis of a reasoned medical judgment, but rather viewed Mr. Wilson as a nuisance, not a patient. Now this case essentially has two parts. There's issues relating to his physical health and issues relating to his mental health. But there are themes that cut across the manner in which the District Court resolved both of these strands of the case. I'd like to emphasize a few of those today. The first thing I'd emphasize is that there really should be a different outcome when you look at the evidence in the light most favorable to Mr. Wilson. If you read through the District Court opinion, I think it's striking that the District Court really sort of emphasized the evidence presented by the government, the defendants, and made light of a lot of the key pieces of evidence that Mr. Wilson presented. And I'd emphasize a couple of those pieces. The first is Mr. Wilson was so confused at one point that he had to be pulled off a bus because he couldn't remember his own name, his own identification number. He was trying to get a CT scan and an X-ray to deal with his severe physical pain, so clearly an instance in which he would never malinger or feign some sort of problem he didn't have. But his mental health problems kept him from getting the physical care that he so desperately wanted. And on the physical side, there's evidence in the record that he was experiencing pain so severe that if he raised his arm to shoulder level, he would see spots and feel like he was on the verge of blacking out. And this was a level of pain. He also described his pain at various points as on a scale of 1 to 10, 10 all the time. This is the pain in his neck. Is that correct? It's correct. It's in his neck and also in his back. Okay. Well, that's where the hardware they talked about. Exactly. And the various doctors say that they really don't want to mess with it because it will be further damage. Exactly, Your Honor. The case was, I think, originally filed. There was an ongoing dispute about whether the hardware should be removed. Over time, there was sort of, I think, a higher level of agreement that there was a significant risk about removing the hardware. So what this case is about as we stand here today, for the large part, is while he was pursuing treatment, so when the doctors were looking to figure out what they could do to identify the root cause and address that root cause, he was in severe pain throughout that entire period. Well, was there some mystery about where the pain was being caused? Because it seems to me this neck problem is basically the whole problem. I think there was representation in the record that the doctors were trying to figure out the source of the pain, but there isn't a mystery that he was in pain throughout the entire period. So I think you can certainly find deliberate indifference, regardless of what they were doing to look for the source of the pain, in their real lack to do anything meaningful about addressing the pain during the three-year period in which he was suffering it. Was there something they could do more than just heavier pain medication? Sure. That seems to be the one dispute. They were disappointed he gave them the same level of treatment. Sure. So essentially, Your Honor, he was on naproxen, which is a leave. He was on Tylenol, and then he was on meloxicam. So general same family of drugs. There were some specific instances during tight periods where he was on narcotics because of the pain in his tooth, and one of the times he was rushed to the ER. But what Dr. Poole, who was the expert that Mr. Wilson spoke with, said is essentially conservative treatment, which boils down to trying a variety of different things until you figure out what works, short of surgery. So there were additional pain medications that could have been attempted short of going to narcotics, and there was certainly physical therapy that could have been used. And actually, in his deposition, Dr. Murphy acknowledges that physical therapy would probably be a good idea, and he also acknowledges that there were other medicines that could be used that were short of the heavy-duty narcotics. I have a curious question. I don't want to interrupt your argument, but there was a line in one of the briefs that said that Wilson's parole was revoked on first-degree murder and attempted robbery charges. Now, that sounds real serious, and yet he's been shipped around to various places, and we spent a lot of months in the one place where it was. Is that still hanging out there? Has he got a long sentence, or do we need to know? I guess not, but I'm curious. I'm not sure it's directly relevant. My understanding, and I'm not involved in that part of his legal issues, is that he is at least eligible to be before the parole board and has been considered and rejected recently. Okay. All right. That answers that. That's all you need to know. Just for context, Mr. Wilson is about, I think, 69 years old at this point. He's not a particularly big man to start with, and he lost 40 pounds during the course of these issues. Certainly recognizing that he's in prison for a reason, he's a frail elderly gentleman at this point. Sort of harmless, you might say. I would say he's someone who needs to be taken care of, not someone who is— Obviously, the state has him in its custody, but he's not a physically strapping individual at this point. But he seems to have been moved around and seen lots of different people and experts, which is what I look at. Of course, the district judge had a long opinion for reciting all of that, and it seems that when we're talking about—is it deliberate indifference? When you're talking about that, that's kind of a high standard for somebody who's seen a lot of doctors. I know there was that one gap of three months when Dr. Murphy, I guess it was, was engaged with lots of other people. There's really 200—what is it? 2,000 people in this prison, one doctor. That's pretty tough. But anyway, that seems to be the only space and time where most of the time he's seen a lot of doctors or people that are looking at him. Sure. He certainly sees a lot of different doctors, and I think looking at that treatment, you can say, well, Dr. Murphy was taking certain steps to try to identify the root cause of these issues. But during that whole period, even while he was seeing these doctors, he was stuck on this very limited pain medication and was in searing pain. And I think that's where the deliberate indifference really comes in, is that he—it's one thing to say, well, we spent five years looking for a cure, but during that five years, we left him in enormous pain. That's where we see the deliberate indifference. And I would say also, I mean, they justify the basically 100-day gap in treatment on, oh, there's lots of people in the facility. But I don't think there's anything in the record that really justifies Dr. Murphy knowing how severe an issue that Mr. Wilson was suffering. He was certainly familiar with the pain that he was in. And something suggests that his prioritization of Mr. Wilson, among these other cases, was reasonable. I think what's actually in the record essentially says that it was—it's kind of unexplainable, but there's a lot going on and things happen. What's his present status and condition? I can represent that he's had additional health issues and has been—he's gone to the ER at least once and has filed additional medical requests. Has he still got the same level of pain medication, or do you know? I don't know. I don't know what medication he's on, Your Honor. Again, this sounds more like medical malpractice than deliberate indifference, really, doesn't it? Well, I don't think so, Your Honor. I mean, I think the— I wouldn't imagine you would think that. At the end of the day, he has—this court has made clear that persisting with ineffective treatment can be the basis for deliberate indifference claim. And I think that's what we have here. Dr. Murphy repeatedly was told about the level of pain that Mr. Wilson was in, but kept him on the same basic set of medications. He didn't try physical therapy. He didn't try other medicines that he knew about and could have tried. And granted that some of what Dr. Poole is focused on in his recommendations may be beyond the scope of what's offered within the facility. So, for example, it may not be possible to do acupuncture within the facility. But there were reasonably available treatment options that Dr. Murphy just didn't think about or didn't bother to pursue and just kept him on this very limited set of medications while he was in severe pain and also forgot about them for 100 days, essentially. And also, as we mentioned, the briefs didn't follow the recommendation for a neurology follow-up. What about other doctors, like Dr. Adams? But also it seemed that other doctors, even his own doctor, were looking in on things. And they were really concerned about doing something about the source of the pain, which is that hardware that he's bothered with. And you say that it should have been with much heavier pain medication. And I don't know what the level of stuff is. And now we have an opiate crisis for people taking too much pain medicine. I don't know if that had anything to do with this case. But still, pain medication at different levels, obviously it's addictive. Maybe it's curative, I don't know, or at least preventive. Makes you feel better, maybe. That seems to be the problem. Sure, Your Honor. I certainly think that a doctor could have thought, I don't want to put him on opiates because of the variety of different issues. I mean, I would note that at various points, for very limited periods, he was put on narcotics. I mean, he was on hydrocodone and another high-powered medicine, codeine, at one point. So this is something they had in their toolkit for limited periods. But they didn't use it, for example, when he's coming to them and saying, this is as bad as it can be. They didn't say, okay, well, here's a brief period where we'll try an opiate. But more broadly, what I'd say, Your Honor, is we're not suggesting that the failure to put him on opiates is somehow a deliberate indifference. Because there are, as you say, there are broader problems. In his deposition, Dr. Murphy, I think, specifically mentions gabapentin and lidocaine as potential other medicines that he could have thought about using but didn't. And then he also mentions that physical therapy probably would have been a good idea, but he wasn't offered that. So there were options short of going down the road that you mentioned, which admittedly does have some potential problems. If I may, I will reserve two minutes of this, okay? Dr. Adams, just to emphasize what was going on there, the key point there is that Dr. Adams never formally diagnosed Mr. Wilson as a malingerer. His diagnosis throughout this period, at the end of this period, remained rule out malingering. So essentially, there was an open question about whether he had dementia, whether he was malingering. And the key question in this case is whether Dr. Adams had made a professional judgment that malingering really was the issue and she was proceeding in a reasonable manner. I think the key piece of evidence we point to is that when Mr. Wilson went to Dr. Adams in 2013 to ask for additional help, after he'd effectively been denied the right to testing because he was presenting the wrong form at the resource center, he was shouted at and berated, essentially, and threatened by Dr. Adams. And that, in line with cases of this circuit, that can be used as evidence that her mental state wasn't one of a doctor using professional judgment. It was one of someone who was deliberately indifferent and had a sort of malicious attitude towards Mr. Wilson. So unless there are further questions, I reserve the balance of my time. Thank you. Thank you. Ms. Schmelzer. May it please the Court, I'm Jody Schmelzer, Assistant Attorney General for the State of Wisconsin, and I represent Drs. Patrick Murphy and Lori Adams. In my argument today, I'll first address Mr. Wilson's Eighth Amendment deliberate indifference claim, and secondly address the state law medical malpractice claims brought by Mr. Wilson and properly dismissed by the district court. The district court's summary judgment decision granting summary judgment on the Eighth Amendment claims against Dr. Murphy is proper for two main reasons. First, it properly looked at the totality of the care that was provided to Mr. Wilson. That's something that this court has told us that we need to first look at when evaluating whether or not an inmate's care and treatment supports a reasonable inference of deliberate indifference. And here we have a five-year span of continuous treatment for Mr. Wilson on his neck issues. He saw five experts, his own medical expert, and in that five-year span and a thousand-page medical record, only two points were brought up by Mr. Wilson as to where there was some kind of deficiency or a recommendation that wasn't followed or a delay in treatment. Otherwise, seeing endocrinologists, seeing an ear, neck, and throat specialist, Dr. McCulloch, seeing speech pathologists to deal with the throat issue and the pain in his throat, seeing an orthopedic surgeon with Dr. Hanna, and also Dr. Ferguson, his pulmonologist. Through all those continuous care and treatment, those specialists made recommendations and Dr. Murphy followed them. Countless diagnostic tests, trying to find the source of these various issues. It wasn't isolated to just pain in his neck that would be caused by a degenerative condition in his neck, by the hardware in there, but he had trouble swallowing, he had inflammation in his throat.  We get to the last consult and he doesn't follow. And by that time, his patient had sued him. Can we draw an inference from that? Is there a genuine issue of triable fact on the fact that the one time he didn't follow was after he'd been sued? Could a jury say it's clear he departed from treating the patient according to professional norms at that point? I don't think so, Your Honor. Referring to Dr. Paul's, this is his own hired expert's recommendation, or I guess conclusion, was he ultimately agreed with conservative treatment. This is something that had been done by Dr. Murphy throughout the five-year period, and no other specialist, by the way, ever recommended physical therapy or acupuncture or any of these other suggestions that Dr. Paul said may or may not work. He never said that this was something that was blatantly inappropriate for Dr. Murphy not to consider these. Does the record indicate whether those services were readily available in the context of prison medical care? It does not indicate that. Would it be nice if the government had sured that up? You are left with that lingering doubt, are we? What we're left with, Your Honor, is the fact that throughout all of the specialists that he's seen, no one recommended that course of treatment. Had they recommended it, Dr. Murphy's totality of care that he provided him shows and demonstrates that he followed those recommendations, except for the one instance where it was noted by his pulmonologist to perhaps follow up with neurology because of numbness in his fingers. And Dr. Murphy considered that, but in exercise of his professional judgment, weighed the fact that he had already been seen and examined by Dr. Murphy for this complaint a month and a half earlier, that he had already been seen by a specialist, a neurologist, Dr. Hanna, earlier in the year, and that he made the determination that the pain medications that he was already on would address what he thought was a pinched nerve causing this numbness. So it's the only time a recommendation wasn't followed, it was with respect to the hand, is that right? It's the only time that has been highlighted in this case, Your Honor. The other instance highlighted by Mr. Wilson in his brief was the three-month delay that he encountered in seeing Dr. Murphy. And I'd just like to point out that during that three-month delay, he did have a medical appointment with Dr. Ferguson at the University of Wisconsin Hospitals and Clinics. So he did see a provider in that three-month period of time. And Dr. Ferguson was... The pulmonologist, Your Honor. He was a pulmonologist. Right. And he was addressing what was ultimately found to be his chronic obstructive pulmonary disease. He has COPD, which Dr. McCulloch attributed to, and Dr. Ferguson attributed to, the problems that he had had breathing and not being able to breathe. So these instances of passing out on the unit and not feeling like he was choking, he had COPD, which was treated, and that treatment is not being challenged in this case. I'd like to now address why summary... So to conclude with Dr. Murphy, Your Honors, the totality of the care there was consistent. He didn't find a cure for a degenerative condition in his neck. The lawsuit was brought because Mr. Wilson wanted surgery. It was deliberately indifferent, he claimed, because he wasn't given the surgery. That obviously evolved when his own expert didn't support that. There is a continuity of care here by Dr. Murphy in changing dosages of medications, trying different medications, giving him the opiates or the stronger narcotics when he thought that was necessary. There's no evidence that that was blatantly inappropriate by any of the other experts, including Dr. Paul. He had every opportunity to opine that past treatment given by Dr. Murphy wasn't consistent, wasn't appropriate, was so far afield from accepted professional judgment that it actually showed that no judgment was made. He didn't say that. He said, you might want to try this going forward. He said nothing about the past care and treatment of Mr. Wilson. So on that basis, summary judgment should be affirmed on the Eighth Amendment claim against Dr. Murphy. Looking at the Eighth Amendment deliberate indifference claim against Dr. Adams, I think, again, that summary judgment should be affirmed because there's no evidence that Dr. Adams knew Mr. Wilson had Alzheimer's and refused to provide him treatment. What the record does show is that she did ultimately determine that he didn't require treatment for Alzheimer's. But there's no decision reached by any medical professional in this case that he actually suffers from dementia or Alzheimer's. He had some memory issues, and we don't dispute that in March of 2012, he didn't know his six-digit inmate number and date of birth. When he got back to the health services unit, he said he wasn't feeling well and he had the chills, and he spent the night in the health services unit. That isolated incident does not give a reasonable inference that he requires treatment for Alzheimer's. And I would submit that the fact that Dr. Adams, when she first saw him in 2009, did note that he appeared to have some cognitive deficiencies, and I believe actually diagnosed him with some kind of cognitive deficiency. That fact shows that she didn't blatantly disregard this issue. She self-reported at that time that he had been treated for Alzheimer's in the community. That was never confirmed throughout the course of this litigation. There's been no evidence that he was ever diagnosed with Alzheimer's by a medical professional and provided treatment. She not only used her own professional judgment, but she also relied on the assessment from his treating psychiatrist, Dr. Thompson, who didn't outright dismiss his request for treatment with Alzheimer's. She assessed him. They clinically monitored him. They brought in a multidisciplinary team from the folks that interact with Mr. Wilson on a daily basis on his living unit, and they saw some discrepancies between the behavior he exhibits every day and the behavior he exhibits when he's being assessed by a clinical staff member. To them, that red-flagged this, that perhaps he's malingering or, at the very least, exaggerating his mental and cognitive disabilities. It didn't stop there, though. They actually did send him to the Wisconsin Resource Center, which is a specialized treatment facility for inmates. For eight months, he was there and assessed... What kind of a facility is that? Is that a confining facility? I'm trying to envision it. Eight months. Right. It's a smaller facility, Your Honor. Its purpose is for inmates with some type of mental health issues and for treatment and specialized environments and staff that are treated to deal with those issues. Well, you asked the same curiosity question I asked the other counsel, and that is on this idea that, at some point, he was accused of murder, but now, apparently, he's at least eligible for parole. That's correct. That's my understanding, Your Honor. He has been before the parole board and denied that, and he was actually revoked for a violent incident with his girlfriend. So I would, although it's not in the record, Your Honor, I would dispute that he's a frail man that poses no danger to the community. He's there for a reason. Okay, but as far as this facility where he was for eight months... Right. It doesn't sound like it's designed for somebody that might cause a problem. It can be, because some of the inmates that do exhibit mental health problems can be quite dangerous, Your Honor. Okay, from that standpoint. Right, but it does have that specialized staff there that are able to deal with mental health problems in a prison setting. And what the staff there found was that, first of all, he would not agree to the neuropsychological testing that would be some objective evidence of dementia twice, and for reasons later, two years later, telling Dr. Adams that it was, as attorney told him, he shouldn't either way. Dr. Adams, reviewing the record from WRC, from the Resource Center, can see that he didn't agree to that testing. That would have provided some objective evidence for them to go ahead, formalize a diagnosis, and provide him some treatment if necessary. That wasn't agreed to. The staff also noted at the Resource Center that his level of confusion had appeared to decrease, that he had minimal distress on the living unit, and that he was dementia-free at the time of his discharge there. He was out on his own. There wasn't somebody, family or anybody else that was advising. He's the one that just could unilaterally refuse to take those tests. To my knowledge, he had an attorney at the time with the disability rights attorneys that he had consulted with, and he claims in his affidavit that that was the reason that he had not agreed to do that, was on advisive counsel, or because it wasn't a correct or proper form. I'd like to address briefly, too, Dr., the allegation that Dr. Adams treated him as a nuisance and yelled and berated him, and that that should provide an inference of deliberate indifference. That incident happened years after she exercised her professional judgment and determined they could not substantiate a diagnosis for dementia or any treatment that would result from that kind of diagnosis. The decision had already been made, and I think that although that's disputed, it has to be taken in Mr. Wilson's favor for purposes of summary judgment. I don't think that that leads to a reasonable inference of deliberate indifference two years after when Mr. Wilson is still demanding treatment for something that she and her exercise of professional judgment in consultation with other mental health professionals didn't believe that he required. Moving on to the state law negligence claim, the district court properly dismissed that because there was no evidence in the record that either Dr. Murphy or Dr. Adams had a professional standard of care. The district court recognized from the Gill case that you can prove a medical malpractice claim without expert testimony where the issue is such that a layperson could conclude from common experience that these mistakes don't happen unless there's negligence. Either with his neck issues or with his Alzheimer's, I submit that this is not something a layperson could determine. If five specialists cannot determine how to resolve these neck issues, I don't think it's within the purview of a layperson to determine that and whether or not the care that was provided to him was negligent. Similarly, issues of mental health, cognitive disorders, Alzheimer's, those issues are not within a layperson's knowledge to either diagnose or to assess whether or not treatment is proper or could be effective for those situations. So the district court did properly grant summary judgment on the state medical malpractice claims as well. I see my time is almost up, so unless there's no further questions, I would ask that the court affirm the district court's summary judgment, granting Dr. Murphy and Dr. Adams summary judgment and dismissing this case. Thank you. Thank you, Ms. Hodge. Mr. Lilley. If I may, I'll just briefly address some of the points that counsel raised. With respect to the totality of the care, certainly, as we've discussed, there was some care provided, but there's nothing in the case law that justifies ignoring pain while providing care. To use another example, if someone had problems with their arms and problems in their legs and you just dealt with the problems in your legs, you wouldn't be able to say, we did a lot for the legs, therefore we were justified in not dealing with the arms. In the same way, there was no justification here for not addressing his pain in a reasonable manner or in a manner that was not otherwise totally indifferent in this case. Just briefly, the second amendment complaint, which was filed, does mention pain. Whatever the case may have begun to be about, by the time it was before the court and summary judgment, pain was front and center and the symptoms were front and center of the dispute. I just want to briefly correct something I said previously. I think I referred to when he was on the bus, he couldn't remember his ID number and birthday. But it was the ID number and birth date just to correct the record on that. Briefly, counsel argued that an expert would be necessary for the negligence claims. We explained in the brief why that's not correct. But just to summarize, we're not disputing the details of treatment here. We're not disputing what type of medicine should be given when. This case is about not receiving treatment for pain and being denied access to mental health care. That's what this case is about. That is not something that an expert is required to explain. So unless there are any other questions, I would just ask that the panel reverse the entry of summary judgments. Thank you, Mr. Lilley. Also, thank you for taking this case, you and your firm. Thanks to both counsels. The case will be taken under advisement.